771 F.Supp. 1496 (1991)
Craton LIDDELL, et al., Plaintiffs,
v.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, et al., Defendants.
No. 72-100 C (5).
United States District Court, E.D. Missouri, E.D.
August 30, 1991.
*1497 *1498 William P. Russell, Joseph McDuffie, St. Louis, Mo., for Liddell, plaintiffs.
Michael A. Middleton, Columbia, Mo., William L. Taylor, Washington, D.C., Wayne C. Harvey, Caldwell, Harvey, Hughes, McHugh & Singleton, St. Louis, Mo., for Caldwell/NAACP, plaintiffs.
Kenneth C. Brostron, Lashly & Baer, St. Louis, Mo., for City Bd., defendants.
Michael J. Fields, Bart A. Matanic, Asst. Missouri Attys. Gen., Jefferson City, Mo., John J. Lynch, Asst. Missouri Atty. Gen., St. Louis, Mo., David R. Boyd, Comey & Boyd, Washington, D.C., for State of Mo., defendants.
Andrew J. Minardi, Joseph D. Ferry, St. Louis, Mo., for St. Louis County, defendants.
Shulamith Simon, Husch, Eppenberger, Donohue, Cornfeld & Jenkins (court-appointed), St. Louis, Mo., amicus curiae.
Craig M. Crenshaw, Jr., Jeremiah Glassman, U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for U.S.
James J. Wilson, St. Louis City Counselor, St. Louis, Mo., for City of St. Louis.
Anthony J. Sestric, Sestric & Cipolla, St. Louis, Mo., for St. Louis Collector of Revenue.
Charles Werner, St. Louis, Mo., for Missouri NEA.
Charles R. Oldham, Louis Gilden, St. Louis, Mo., for St. Louis Teachers Local Union 420.
Henry D. Menghini, Robert J. Krehbiel, Evans & Dixon, St. Louis, Mo., for St. Louis County School Districts  Affton & Lindbergh.
Darold E. Crotzer, Jr., St. Louis, Mo., for Bayless, Jennings, Normandy & Wellston.
Bertram W. Tremayne, Jr., Tremayne Lay Carr Bauer & Nouss, St. Louis, Mo., for Kirkwood & University City.
Frank Susman, Susman Shermer Rimmel & Shifrin, St. Louis, Mo., for Ferguson-Florissant.
George J. Bude, St. Louis, Mo., for Brentwood, Clayton & Hancock Place.
Robert P. Baine, Jr., St. Louis, Mo., for Hazelwood.
Robert G. McClintock, St. Louis, Mo., for Ladue.
Richard H. Ulrich, Summers Compton Wells & Hamburg, St. Louis, Mo., for Maplewood-Richmond Heights.
John Gianoulakis, Kohn Shands Elbert Gianoulakis & Giljum, St. Louis, Mo., for Mehlville, Pattonville & Ritenour.
Donald J. Stohr, James W. Erwin and R.J. Robertson, Thompson & Mitchell, St. Louis, Mo., for Parkway.
Douglas A. Copeland, Robert W. Copeland, Copeland Gertner & Thompson, St. Louis, Mo., for Webster Groves.
Thomas Tueth, Audrey Fleissig, Ian Cooper, Peper Martin Jensen Maichel & Hetlage, St. Louis, Mo., for St. Louis County Special & Rockwood.
Kenneth V. Byrne, Schlueter & Byrne, St. Louis, Mo., for Valley Park.
Dr. Robert Bartman, Com'r, Mo. Dept. of Elementary & Secondary Educ., Jefferson City, Mo., for Mo. Dept. of Elementary & Secondary Educ.
Edward J. Murphy, Jr., Garry K. Seltzer, St. Louis, Mo., for Riverview Gardens.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
This matter is before the Court regarding asbestos abatement in the St. Louis city public schools. Pursuant to Order L(3403)91, a hearing was held on June 28, 1991 to review the costs of the City Board's asbestos abatement program. Subsequent to the hearing, the State and the City Board filed post-hearing briefs and responses, L(3493)91, L(3494)91, L(3497)91, L(3498)91 and L(3499)91.
In Order L(3403)91, the Court made specific findings as to the State's fiscal liability for a portion of the City Board's asbestos abatement expenses. The only remaining issue to be resolved regarded the accuracy and reasonableness of costs. Order L(3403)91 was very clear on this point. The Court was not going to scrutinize the asbestos abatement program as to whether *1499 each one of the 101 schools involved should have or not have been cleaned up in a particular way. The State, however, chose to ignore the Court's directive and embark on a full-scale attack of the asbestos abatement program. The principal thrust of the State was to attack the need for some aspect of the abatement program, primarily the removal of vinyl asbestos floor tile (VAT).
The State's own agenda became obvious from the moment discovery began. It has alleged a variety of discovery violations, and complains of prejudice because it was denied several extensions of time in order to obtain more data, more documents, acquire more witnesses, and inspect more schools. The Court did not prejudice the State in any way. The discovery cut-off date was made clear from the very beginning. The scope of the hearing was very limited and thus, discovery should have been equally limited in nature. The State went beyond that which the Court feels was necessary. It insisted on pursuing its own hearing agenda and not keeping to the issue at hand.
The City Board did not violate any rules regarding discovery. By the State's own account, it had continual access to numerous boxes and file cabinets of documents and records. Its chief complaint is that it could not find what it wanted to find. This is not any fault of the City Board. Rule 34, Fed.R.Civ.P., directs that "[a]ny party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." The State requested everything under the sun and the City Board gave them access to it all. The City Board was not obligated to wrap up the volumes of data into neat little packages for the State. The City Board also was not obligated to provide the State with the cost summaries it provided to the Court as part of its pre-hearing brief. Such cost summaries are the work product of counsel; not discoverable evidence. All the information utilized in the cost summaries was made available to the State. Finally, it appears that on several occasions the information requested by the State was provided in one form or another, yet the State repeatedly requested the same information again. The City Board is not obliged to honor repeated requests for the same information once it has provided it.
After reviewing the parties' briefs, testimony and evidence adduced at the hearing, and the relevant federal asbestos abatement laws, the Court finds that the City Board carried out its asbestos abatement program (and continues to do so) as regulated by the Asbestos Hazard Emergency Response Act (AHERA), 15 U.S.C. § 2641-2656 (1990) and the National Emission Standard for Asbestos (NESHAP), 40 CFR § 61.140, et seq., and numerous EPA regulations, while adhering to the mandates of this Court's orders, L(1570)87 and L(2090)88.
The City Board requests partial reimbursement for actual costs of abatement (as of June 1, 1991) at $17,467,617.00 and then a quarterly payment schedule for projected costs as they accrue. With respect to the actual costs, the State failed to successfully attack the accuracy of the figures. Instead, it spent a substantial amount of time attacking the way the management plans were developed, the need for change orders, and as stated previously, the need for some types of abatement work.
The management plans were developed by outside personnel. The Court has no quarrel with the use of outside help in this instance. The State's witness, Mr. Walter Joannpeter, testified that such work should have been done in-house, but he also admitted that he was unaware of the time constraints or the magnitude of the ongoing capital renovation work. More importantly, he was ignorant of whether or not the City Board had on-staff AHERA-accredited management planners to do such work. The State failed to produce any evidence that there were enough qualified City Board personnel to draft management plans quickly for 101 schools.
As for the change orders, it is reasonable to assume that some of the change *1500 orders were not absolutely necessary. However, it is also reasonable to assume that some of the change orders were absolutely necessary. The point is that change orders often are instituted as a response to a sudden or unexpected occurrence in the middle of an on-going activity. City Board staff are in the best position to adjudge the need for a change order. In some cases, additional work was ordered and in some cases work already ordered was eliminated. The State believes that change orders were the result of arbitrary management decisions and failure to undertake steps "to minimize instances when asbestos might be found unexpectedly during abatement work or in the course of general renovations." L(3494)91, p. 27. It offered no proof of this alleged fact. It failed to show what steps should have been taken, but were not which would have prevented the unexpected.
The State also believes that it had the right to regulate change orders.
"At no time did the Board present change orders to the State for the State's approval or disapproval. The State did not request that change order work be done. In the absence of State concurrence to change order work, City Board should not recover from the State for change orders generated during the Board's asbestos removal activities."
L(3494)91, p. 24.
The City Board was not obligated, under any Court order at any time, to seek the State's approval for any change order. Other than federally-mandated review of asbestos management plans, the State chose not to involve its personnel in the City Board's asbestos abatement program. It did not participate in the formation of an overall plan for asbestos abatement in the city schools nor did it initiate meetings with the City Board staff to review the asbestos situation. It did not even seek court-intervention to force the parties to work together to address the asbestos problem. So, the Court is at a loss as to why the State now believes it had some type of veto power regarding change orders.
Finally, the Court finds the asbestos abatement work regarding the floor tile and reinsulation (e.g. pipes, furnace ductwork, etc.) to be proper under the circumstances of this case. Asbestos abatement procedures are governed by a myriad of regulations, rules and policy statements promulgated by federal statutes such as AHERA and NESHAP, and the EPA. The Court has sorted through this maze of bureaucracy and concludes that there is no single definitive answer to every abatement problem. When the Court issued Order L(3403)91, it naively referred to asbestos abatement work in terms of "removal." Since issuing Order L(3403)91, the Court has become better acquainted with the asbestos problem and the proper methods for dealing with asbestos. AHERA, NESHAP and EPA regulations identify five asbestos "response actions": maintenance, repair, encapsulation, enclosure and removal.[1] The Court cannot limit abatement costs only to "removal" costs because of the Court's initial limited knowledge of asbestos terminology and, therefore, its mistaken belief that asbestos abatement generally meant removal of asbestos only.
With regard to the costs associated with the removal of floor tile (commonly referred to as VAT  vinyl asbestos tile), the Court is unable to state with any certainty that AHERA, NESHAP or EPA regulations either require or prohibit removal of VAT. It appears, though, that crucial to a decision regarding removal of VAT is the potential for release of asbestos fibers.
Asbestos-containing material (ACM) is either in a friable or non-friable condition. The term "friable" refers to the potential for an ACM to release asbestos fibers. The problem is that all the regulations, taken as a whole, present a very confusing picture as to what circumstances require removal of VAT. The problem is compounded by the fact that in certain situations non-friable ACM can become friable. *1501 The City Board argues that VAT as a regulated ACM must be removed prior to renovation work if it is in poor condition or will be sanded, sawed, drilled, cut or similarly disturbed. The State, on the other hand, argues that VAT, in good condition, is non-friable and as non-friable VAT, it does not have to be removed unless renovation work would damage it to the extent that significant amounts of asbestos fibers would be released. Such damage would constitute crumbling, pulverizing, or in some manner reducing the VAT to powder.
The State's expert, Jack Garrett, testified that the floor tile in the schools was in a good non-friable condition. He further testified that he did not believe that renovation of the buildings would damage the VAT in such a way that would require removal under AHERA. He did agree that there were other experts in the field with a differing opinion. He further admitted that he had not been a certified inspector for at least two years and was generally unfamiliar with NESHAP. Finally, Mr. Garrett testified that above all else, the health and safety of the students must be considered. As he succinctly put it, abatement activities must quickly be completed even in schools eventually to be closed, because "[y]ou're protecting our kids, you're protecting the greatest resource we have; the only resource we have; the only resource we have that is worth anything."
The Court concurs with Mr. Garrett's opinion that asbestos abatement must consider foremost the safety and welfare of the children. When faced with a complex (and often confusing) set of asbestos regulations, the Court feels that the most prudent thing for any school to do when the health and safety of children are involved, is to remove the ACM if school officials believe there is a possibility for release of asbestos fibers. Given the age of the schools and the extent of renovation activities, this Court cannot fault the City Board for opting to remove the VAT. Furthermore, it would be irresponsible and careless for the City Board to endanger some students lives by not removing the VAT simply because fate put them in a school that is scheduled to be closed at some future point in time. Even the State's expert testified that as long as children were in the school, abatement activities should be carried out.
The only problem the Court has with the City Board's accounting of its actual costs (as of June 1, 1991) is an approximate 2.6 million[2] discrepancy between the actual cost figure stated in November 1990  $14,909,172.00, L(3150)90, and the actual cost figure presented at the hearing  $17,467,617.00. City Board Trial Exhibits 5, 6 and 8. Although the Court assumed a small revision in figures between the time of filing, L(3150)90 and the hearing, the $2.6 million discrepancy remains unsatisfactorily explained. In its post-trial brief, City Board counsel states that the reason for the increase of $2.6 million is additional abatement completed since October 1990, and the omission of air monitoring and administrative costs from L(3150)90. However, City Board witness Joan Hubbard testified at both her deposition and the hearing that no abatement activities took place between October 1990 and June 1, 1991. Her fellow administrator, Mr. Glen Vandelicht, concurred at his deposition that no abatement activities took place between October 1990 and June 1, 1991. Furthermore, the City Board has failed to show what portion of the mysterious $2.6 million represents the previously omitted air monitoring costs. The only part of the discrepancy the City Board can document is $802,787.00 in administrative costs. City Board Trial Exhibit 7.
The Court will allow the $802,787.00 in administrative costs, but will disallow the remainder of the suspect $2.6 million in actual costs. Thus, the total actual costs for asbestos abatement in the city schools as of June 1, 1991 is $15,711,958.81. The actual costs for asbestos abatement in L(1570)87 schools is $10,695,699.18 as of June 1, 1991. The actual costs for asbestos abatement in L(2090)88 schools is $4,213,472.63 as of June 1, 1991. The actual costs *1502 for administering the asbestos abatement program is $802,787.00 as of June 1, 1991.
Since this Court has previously found asbestos abatement work to be a necessary part of the capital improvements program, it is reasonable to assess the State's funding obligation in line with the funding formulas already set out in orders L(1570)87 and L(2090)88. Thus, the State will fund 50% of the L(1570)87 schools' abatement costs, or $5,347,849.50; 71.5% of the L(2090)88 schools' abatement costs, or $3,012,633.00, and 50% of the administrative costs, or $401,393.50. The State's share of total actual costs for asbestos abatement in the city schools, as of June 1, 1991 is $8,761,876.00.
The issue of future or projected abatement costs is a more difficult one to resolve. Consistent with its findings regarding actual costs, the Court finds that the City Board is entitled to State reimbursement for 50% of projected abatement costs at L(1570)87 schools, 71.5% of projected abatement costs at L(2090)88 schools, and 50% of projected administrative costs to implement the asbestos program. However, the City Board's proposed "quarterly payment voucher" system is impractical. It prevents review by the State as to accuracy and reasonableness of the costs and is open to abuse. Equally impractical is a hearing every three months or even twice a year. The Court is confident that a "checks and balance" system can be worked out amicably between the City Board and the State, with assistance from the Financial Advisor. A payment method must be developed which affords the State the opportunity to review the costs while allowing the City Board to continue the prompt implementation of its asbestos abatement program.
Finally, it is a little late for the State to seek control of the asbestos abatement program. The management plans have been developed and approved. A significant number of schools have been cleaned up and many schools almost completely abated. The equitable relief requested by the State would delay further implementation of the asbestos program, even bringing it to a screeching halt. The State has presented no evidence which shows that the work is not being carried out properly, i.e. in an acceptable workmanlike manner. The Court has already found the plans implemented thus far are within the statutory guidelines and EPA regulations, as well as the mandates of this Court. There is no reason to impose any other restrictions upon continued implementation of the asbestos abatement plans.
The City Board has acted in a reasonably prudent manner to begin ridding its schools of asbestos and to provide its students and staff with a safe learning environment. The Court hopes the City Board can soon finish what it has so aptly begun.
Even in this day of uncertain scientific accuracy, the Court must accept the regulations identifying five asbestos "response actions": maintenance, repair, encapsulation, enclosure and removal. These response actions are underway in office buildings, religious facilities, hospitals, public structures and even in homes. Schools must have the same, or even more demanding treatment.

ORDER
In accordance with the memorandum opinion filed herein this date,
IT IS HEREBY ORDERED that the total costs for asbestos abatement in the city schools as of June 1, 1991 is $15,711,958.81. This total amount represents $10,695,699.18 in abatement costs for L(1570)87 schools; $4,213,472.63 in abatement costs for L(2090)88 schools, and $802,787.00 in administrative costs.
IT IS FURTHER ORDERED that the State's share of asbestos abatement costs in the city schools as of June 1, 1991 totals $8,761,876.00. This total amount represents 50% of abatement costs in L(1570)87 schools or $5,347,849.50; 71.5% of abatement costs in L(2090)88 schools or $3,012,633.00, and 50% of administrative costs or $401,393.50.
IT IS FURTHER ORDERED that the State's share of asbestos abatement costs as of June 1, 1991 be paid in four payments *1503 of equal amount. The quarterly payment of $2,190,469.00 shall be made on or before September 20, 1991; December 31, 1991, March 30, 1992 and May 29, 1992. The Department of Elementary and Secondary Education (DESE) shall timely certify to the Commissioner of Administration (Commissioner) the amount of the payment and to whom the payment is to be made. Immediately thereafter, the Commissioner shall issue a warrant in the amount and to the party set forth in the DESE's certification. Upon receipt of the warrant, the Treasurer of the State of Missouri shall issue and sign a check in the amount and to the party set forth in the warrant.
IT IS FURTHER ORDERED that the City Board and the State shall meet with the Financial Advisor to discuss and develop a payment schedule for future asbestos abatement costs as they accrue. This payment program should allow the State reasonable time to review the costs prior to payment. The State's share of costs shall continue to reflect the allocation as set forth in the attached memorandum. The State's review of accrued future costs shall be strictly limited to the reasonableness and accuracy of costs. As long as the content of the asbestos abatement program continues to be implemented in accordance with this order and memorandum, the City Board shall be left in control of it.
IT IS FINALLY ORDERED that the Financial Advisor shall begin discussions with the State and City Board immediately and report back to the district court within sixty (60) days of this Order as to the resolution of this matter.
NOTES
[1] For a concise guide to asbestos and asbestos management procedures, see EPA pamphlet: The ABC's of Asbestos in Schools, June 1989.
[2] The actual figure is $2,558,445.00.